**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| DEMCHAK PARTNERS LIMITED, et al., on behalf of themselves all others similarly situated, | : : : : | |
| Plaintiffs, | : : | Civil Action No. 3:13-cv-2289 |
| | : : | Judge Mannion |
| v. | : : | |
| CHESAPEAKE APPALACHIA, LLC, | : : | |
| Defendant. | : : | |

_____

**OBJECTIONS OF CLASS MEMBER LILLIAN SARNOSKY TO
AMENDED CLASS ACTION SETTLEMENT AGREEMENT**
_____

Lillian Sarnosky, a member of the settlement class in this case, appears through her undersigned counsel to state her objections to the Amended Class Action Settlement Agreement (the "Proposed Settlement").[1]  This litigation involves leases that represent agreed economic obligations that are of tremendous importance to the class members.  The Proposed Settlement purports to extinguish claims class members have against Chesapeake (and others that are not identified) and to bind class members in perpetuity to a royalty payment calculation method at odds with class members' Market Enhancement Clause ("MEC") lease term, notwithstanding

_____

[1] As required by the notice sent to class members, Mrs. Sarnosky's address is 634 Pond Rd., Mehoopany, PA 18629, and her telephone number is (570) 240-1956.  Her Chesapeake Owner Number is 9129827.

any future change in Pennsylvania law.  Accordingly, the Proposed Settlement requires close judicial scrutiny, particularly given recent allegations by the Pennsylvania Attorney General about representations that leases like class members' would be free of deductions for post-production costs.[2]

Unfortunately, the Motion for Final Settlement Approval does not offer sufficient factual detail about a number of critical matters.  There is no analysis of the specific lease language at issue, analysis of how Pennsylvania law applies to that lease language, or justification for the difference between the percentage used to calculate past relief (55%) and the lower percentage used to calculate going forward relief (34%).[3]  By failing to offer a sound factual basis for the Proposed Settlement, the proponents of the settlement have failed to carry their burden to establish that it is a fair, reasonable, and adequate resolution of the class claims.

The Proposed Settlement, on its face, is not fair, reasonable, and adequate for several reasons:

- Without the motion for final approval analyzing the pertinent lease language or discussing the leading Pennsylvania cases concerning whether gas is "marketable" at the wellhead, the Proposed Settlement purports to cement an ongoing course of deductions for post-production costs in Chesapeake's favor in perpetuity—irrespective of any future legal developments—that wrongly presumes without any factual support offered both that gas is marketable at the

---

[2] The Attorney General's lawsuit against the Chesapeake companies, filed December 9, 2015, is styled *Commonwealth v. Chesapeake Energy Corp.*, No. 2015IR0069 (Bradford Co. Ct. Common Pleas).

[3] The most obvious explanation for this is that past relief is much less expensive for Chesapeake than future relief.  Because Chesapeake has only partially developed class members' land by engaging in "leasehold drilling," where a minimal number of wells are drilled to hold acreage by production, the vast majority of class members' gas—and money—is still in the ground.  So paying 55% of a small percentage of total production is much cheaper than paying 55% of total production.  Other than being less expensive for Chesapeake, there is no apparent justification for this settlement structure.

PHDATA 5537341_6

wellhead **and** that Chesapeake has enhanced the value of the gas in every case by selling it downstream.  The settlement thus contradicts the lease language in a manner that eliminates the protections promised by the MECs and unfairly and unreasonably favors Chesapeake over the class;

- The Proposed Settlement provides inconsistent relief in a way that treats some class members better than others.  There is greater relief for past wrongs—a refund of 55% of post-production deductions improperly taken by Chesapeake prior to June 1, 2014—than for royalties after June 1, 2014, and into the future—a 34% refund and 34% reduction of Chesapeake's improper deductions in perpetuity.  If 55% of damages is a fair amount for damages on June 1, 2014, why is 34% fair for damages on June 2, 2014?  The proponents of the settlement do not provide any explanation justifying the inconsistent relief for past and future conduct;

- The Proposed Settlement includes an overly broad release that reaches and releases claims beyond those raised in the complaints, including claims against unidentified third parties and challenges to sales made to Chesapeake affiliates instead of at arm's length in the open market, a course of conduct that has been called into doubt by the Attorney General's lawsuit against Chesapeake;[4] and

- The final approval papers and motion for fees do not provide an adequate factual basis to support the requested fee of 33.3% of the 34% reduction in deductions implemented in the going forward relief for three years, which itself creates a divide between the interests of Class Counsel and those of the class because Class Counsel will benefit financially if Chesapeake charges higher costs against the class members' royalty payments.

These deficiencies must be addressed to ensure a settlement that adequately protects the interests of Mrs. Sarnosky and other class members.

---

[4] In this respect, the Attorney General has filed an *amicus* brief in these proceedings to object to the Proposed Settlement in part because the broad release language purports to insulate various unidentified third parties from liability.  (*See* Attorney General Amicus Br. at 8 (Docket No. 113).)

## FACTUAL BACKGROUND

### A.      Mrs. Sarnosky's Leasehold Interest

Mrs. Sarnosky entered into an oil and gas lease with Chesapeake on November 9, 2009, involving 4.8 acres in Wyoming County, Pennsylvania.  A copy of Mrs. Sarnosky's lease, which includes a MEC, is attached hereto as Exhibit A.

Chesapeake has produced gas from Mrs. Sarnosky's property since June 2013.  From the beginning, Chesapeake has improperly taken deductions based on purported post-production costs.  It has done so despite the fact that the lease contains a MEC that prohibits Chesapeake from taking such deductions unless it enhances the value of the gas, and even such deductions are limited to gas that is "marketable."

### B.      The Proposed Settlement

On December 2, 2015, Class Counsel filed their motions and supporting briefs for final approval of the Proposed Settlement for fees.  (Docket Nos. 97 to 101.)  In part, the Proposed Settlement purports to bind class members to a royalty payment methodology that will permit Chesapeake to take 66% of its purported post-production costs despite MEC language that prohibits such deductions.  The motion for final approval of the Proposed Settlement does not address that, under the agreement's terms, this arrangement is to continue in perpetuity "notwithstanding any current or future law, statute, judicial decision, or rule regulating the payment of Royalties in Pennsylvania."  (Proposed Settlement at ¶ 6.8.)  Thus, if Pennsylvania's General Assembly were to pass legislation for the express purpose of correcting Chesapeake's improper deduction practices, such legislation would not benefit any class members bound by the Proposed Settlement.  Further, if the Attorney General were to win injunctive relief against Chesapeake in the pending lawsuit, the Proposed Settlement would purport to insulate Chesapeake from having to change its improper deduction practices.

In exchange, Chesapeake receives a release "from any and all claims the Settlement Class Members may have against Chesapeake or its affiliates based on the calculation, payment, and/or reporting of royalties pursuant to a Pennsylvania Lease." (Mem. in Support of Final Approval at 8.) The actual release in the Proposed Settlement provides that

> As of the Effective Date, Plaintiffs and the Settlement Class Members, and each of them, for themselves and their respective heirs, agents, officers, directors, shareholders, employees, consultants, joint venturers, partners, members, legal representatives, successors and assigns, hereby expressly agree that they fully and forever release and discharge Defendant, and its parents, present and former affiliates, and subsidiaries, and their respective predecessors, successors, assigns, present, former and future officers, directors, employees, agents, any third party payment processors, independent contractors, successors, assigns, attorneys and legal representatives . . . from any and all of the Settled Claims, except for the rights and obligations created by this Settlement Agreement, and covenant and agree that they will not commence, participate in, prosecute or cause to be commenced or prosecuted against the Defendant Releasees any action or other proceeding based upon any of the Settled Claims released pursuant to this Settlement Agreement. ***Plaintiffs and the Settlement Class Members hereby further agree that they fully and forever release and discharge all working interest owners on whose behalf Defendant has paid or will pay Royalties pursuant to Pennsylvania Leases from any and all of the Settled Claims, but do so only to the limited extent of Defendant's payments of Gas Royalties on behalf of such working interest owners.***

(Proposed Settlement at ¶ 12.1.1 (emphasis added).) In turn, the Proposed Settlement defines Settled Claims, in pertinent part, as

> any and all claims and causes of action related to the calculation, amount, payment, and/or reporting or Royalty payments made by Chesapeake and/or its Affiliates . . . either on its own working interest share or on behalf of other working interests, on Gas produced pursuant to a Pennsylvania Lease . . . . The Settled Claims include, but are not limited to, claims for breach of contract, fraud, conspiracy, breach of implied duties and covenants, unjust enrichment, accounting, and injunctive relief. The Settled Claims also include (i) ***challenges to the manner in which sales are made to an affiliated entity, if any***, (ii) claims that formation, sale or disposition of assets or equity interests by

Chesapeake and/or its Affiliates . . . impacted Royalty payments, and (iii) any other challenges to the reasonableness of Post-Production cost deductions.

(Proposed Settlement at ¶ 1.38 (emphasis added).)

### C.   Class Notice of the Proposed Settlement and Reaction Thereto

On or about November 2, 2015, Class Counsel mailed a notice of the Proposed Settlement.  According to their filing, they mailed more than 15,343 copies of the notice.[5] (Mem. at 11.)  By the time of Class Counsel's filing for final approval on December 2, 2015, more than 102 class members had already opted out of the Settlement Class, covering more than 179 separate leases.  (Devery Decl. ¶ 12.)

## ARGUMENT

### I.   THE SETTLING PARTIES HAVE FAILED TO SATISFY THEIR BURDEN OF SHOWING THAT THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE

Under Rule 23(e), a proposed class settlement must be found "fair, reasonable, and adequate" following a hearing before it may be approved by a court.  *See In re NFL Players Concussion Injury Litig.*, 775 F.3d 570, 581 (3d Cir. 2015).  This requirement exists to "provide transparency for class members and authority to the district court ***to act as a fiduciary for putative class members by guarding the claims and rights of absent class members*."  *Id.*

---

[5] The Declaration of Brian S. Devery (Docket No. 97) offered in support of the settlement states that he received a class list "containing 15,353 Class Members."  (Devery Decl. ¶ 4.)  However, it is not clear whether there were 15,353 unique recipients.  That is, it is not clear whether there are 15,353 class members or whether Class Counsel mailed 15,353 notices to fewer than 15,353 persons.  On information and belief, some individual class members received multiple notices and, in some cases, dozens of duplicate notices.  Mr. Devery admits this confusion.  (*Id*. ¶ 13.) Class Counsel themselves are not precise about whether there are 15,353 class members or 15,353 notices: their memorandum in support of the motion for final approval claims in one place that more than 15,000 notices were mailed (Mem. at 10-11) and, in another, that there are more than 15,000 class members (*id*. at 18).

PHDATA 5537341_6

(emphasis added) (internal quotations omitted); *see In re Pet Foods Prods. Liab. Litig.*, 629 F.3d 333, 349-50 (3d Cir. 2010); *In re Cendant Corp. Litig.*, 264 F.3d 201, 231 (3d Cir. 2001) (deeming district judges presiding over class settlement proceedings to be fiduciaries of the class).

The Third Circuit has announced nine factors, known as the *Girsh* factors, which must be established before a court may approve a proposed class settlement.  *See Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975).  It is the burden of the proponents of the settlement to establish that these factors weigh in favor of approving the settlement.  *See In re Pet Foods Prods. Liab. Litig.*, 629 F.3d at 350.  To do so, the proponents of the settlement must create a record and offer sufficient evidence to permit the court to make specific factual findings that each of the *Girsh* factors is met.  *See id*.  "Because district courts must make findings as to each of the *Girsh* factors . . . the court cannot substitute the parties' assurances or conclusory statements for its independent analysis of the settlement terms."  *Id.* at 350-51 (citing *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 283 (7th Cir. 2002) (cautioning against "paint[ing] with too broad a brush [and] substituting intuition for . . . evidence and careful analysis")).

The motion for final approval formulaically addresses the *Girsh* factors but the submission's assurances and generalities do not develop an adequate factual record or offer sufficient analysis to permit the Court to perform its duty to make specific factual findings that the settlement warrants approval.  The deficiency in the record is particularly pronounced given settlement terms that, on their face, appear to be unfair.

## II.   THE MOTION FOR FINAL APPROVAL DOES NOT EXPLAIN WHY THE PROPOSED SETTLEMENT IS FAIR UNDER CLASS MEMBERS' MEC TERMS

The most significant flaw in the Proposed Settlement is that it permits Chesapeake to engage in a course of conduct that is contrary to the MECs.  Notwithstanding the recitation that

PHDATA 5537341_6

the Proposed Settlement "shall not modify how any other entity calculates and/or pays Royalties pursuant to the Pennsylvania Leases" (Proposed Settlement at ¶ 6.6), the settlement terms do that by, in effect, overriding the MEC terms.

In essence, the settlement's proposed future royalty payment method requires class members to accept as unrebuttable facts that gas is always marketable at the wellhead and that Chesapeake always enhances value in every case merely by selling the gas downstream of the wellhead. The settlement proponents, though, fail to provide a legal or factual analysis of how the settlement's lynchpin assumptions of marketability and enhancement fit the lease terms. Analysis of the lease language and Pennsylvania law shows why the Proposed Settlement is inadequate and unfair in this respect.

### A. The Leases Contemplate That Royalties Will Calculated Based on Downstream Sales of Marketable Gas, Not Transfers at the Wellhead

Mrs. Sarnosky's lease is a Chesapeake form lease and is likely similar to—if not identical to—a great number of the class members' leases in terms of its royalty provision and its MEC. Concerning the calculation of royalties, her lease states:

> ROYALTY: To pay Lessor as Royalty, less all taxes, assessments, and adjustments on production from the Leasehold, as follows: . . .
>
> (b) GAS: To pay Lessor an amount equal to one-eighth (1/8) of the *revenue realized* by Lessee for all gas and the constituents thereof *produced* and *marketed* from the Leasehold, less the cost to transport, treat and process the gas and any losses in volumes to *point of measurement that determines revenue realized by Lessee* . . . .

Ex. A, Royalty Clause (emphasis added).

As an initial matter, the MEC has to be read and understood in the context of the royalty provisions in the standard form lease. This language expressly contemplate that the royalties will be calculated based on Chesapeake's *marketing* of the gas downstream of the wellhead, not

based on a transfer of produced gas at the wellhead to a marketing affiliate that will then resell the gas at higher prices into readily available markets.  The royalty clause expressly contemplates that the royalty will be based on gas not only **produced** but also **marketed** from the leasehold, with the point of measurement being the downstream point at which Chesapeake realizes revenue from the gas.

Although Chesapeake may contend that the gas theoretically is marketable at the wellhead, any such theoretical argument is inconsistent with the available facts.  Here, Chesapeake is not "marketing" the gas at the wellhead.  To the contrary, Chesapeake claims to class members that it is merely transferring gas at the wellhead for marketing downstream by its affiliated company CEML.  (*See* September 17, 2015 Letter from Keith E. Moffatt at 1.)[6] Significantly, and contrary to the representations in the Moffatt letter, the Attorney General alleges that Chesapeake and CEML are parties to a contract that provides that CEML takes title not at the wellhead but at the connection point to the interstate pipeline where CEML sells the gas to third parties.  (*See* Attorney General Compl. ¶ 171).  Even without the affiliate relationship, the form leases such as Mrs. Sarnosky's require royalties to be paid on revenue realized at the point of realization on gas marketed from the leasehold and contemplate royalties calculated on **downstream sales**.

The motion for final approval of the Proposed Settlement does not address the lease language requiring that the gas not only be produced but also that it be **marketed**.  The motion for final approval also does not address the provision in the royalty clause permitting deductions

---

[6] A copy of the Moffatt Letter is attached hereto as Exhibit B.  It has been redacted to protect the identity of the recipient from public disclosure.

only for the cost to transport, treat, and process the gas to bring it to the open market,[7] which demonstrates an intent and understanding that the gas is **not marketable at the wellhead**. If the royalty clause were intended to permit royalties to be calculated solely based on a transfer of title at the wellhead, it would not have included such language concerning the marketing and transportation of the gas to a downstream point of sale at which revenue is realized. In any event, the motion for final approval of the Proposed Settlement does not offer any factual analysis to demonstrate that gas is marketable at the wellhead.

Reading the royalty clause in a way that ignores those clear provisions in the lease language would violate a fundamental principle of contract construction in Pennsylvania. Under Pennsylvania law, an oil and gas "lease is in the nature of a contract and is controlled by principles of contract law." *T.W. Phillips Gas & Oil Co. v. Jedlicka*, 42 A.3d 261, 267 (Pa. 2012) (citing *J.K. Willison v. Consol. Coal Co.*, 637 A.2d 979, 982 (Pa. 1994)). Like other contracts, therefore, such leases must be construed in "accordance with the terms of the agreement as manifestly expressed, and [t]he accepted and plain meaning of the language used, rather than the silent intentions of the contracting parties, determines the construction to be given the agreement." *Id*. (internal quotations omitted). Under Pennsylvania law, one must read a contract in a manner that ascertains the parties' intent and gives effect to all of the expressed provisions if at all possible. *See Riverside Sch. Dist. v. Career Tech. Ctr.*, 104 A.3d 73, 76 (Pa. Commw. Ct. 2014). Here, those provisions clearly reflect an understanding that the gas will have to be moved to a downstream point of sale to be marketable and that deductions may not be taken unless Chesapeake actually enhances the value of the gas beyond what renders it

---

[7] These deductions, however, are in turn specifically negated by the MEC, as discussed below.

marketable to third parties to receive better prices (*e.g.*, by selling the gas further downstream at in a more lucrative market).

In addition, Pennsylvania law has long recognized that oil and gas leases contain implied covenants. *See, e.g.*, *Kleppner v. Lemon*, 35 A. 109, 109 (Pa. 1896). Among those is an implied covenant that the lessee act in the best mutual interests of itself and the lessor. *See Hill v. Joy*, 24 A. 293, 295 (Pa. 1892) (*per curiam*). Pennsylvania also recognizes that an implied duty of good faith and fair dealing is present in all contracts. *See Herzog v. Herzog*, 887 A.2d 313, 317 (Pa. Super. Ct. 2005). Reading the lease language to permit Chesapeake to take deductions as if it has enhanced the value of the gas in every instance merely by selling it downstream runs counter to these implied covenants.

**B.    The MEC Expressly Prohibits Deductions of Post-Production Costs That Do Not Enhance the Value of the Gas To Receive a Better Price**

While the standard form lease royalty provision discussed above permits taking certain deductions, Mrs. Sarnosky's lease, like the leases of other class members, also includes a MEC. Based on the MEC deductions may not be taken unless Chesapeake actually enhances the value of the gas beyond what renders it marketable to third parties to receive better prices. The Proposed Settlement's future royalty calculation method, though, gives no effect to the MEC. Instead, the settlement proceeds from the assumption that the standard lease royalty provision remains unaffected by the MEC, allowing Chesapeake to deduct post-production costs (albeit at a slightly reduced percentage) as if the MEC's language has no effect on the post-production cost provisions of the standard form royalty provision the MEC overrides. That result cannot be reconciled with the lease language without rendering the MEC pointless.

Mrs. Sarnosky's MEC mirrors one of the example MECs in the class notice and is typical of the MECs at issue in this litigation. It provides:

It is agreed between the Lessor and Lessee that, *notwithstanding any language herein to the contrary*, all oil, gas or other proceeds accruing to the Lessor under this lease or by state law *shall be without deduction, directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas and other products produced hereunder to transform the product into marketable form*; however, any such costs which result in *enhancing the value of the marketable oil, gas or other products to receive a better price* may be deducted from Lessor's share of production so long as they are based on Lessee's actual cost of such enhancements.  However, in no event shall Lessor receive a price that is less than, or more than, the price received by Lessee.

(Sarnosky Lease at "Exhibit A," Market Enhancement Clause (emphasis added).)  These leases must be read to give effect to the MECs, which apply "notwithstanding any language" in the lease to the contrary, including the deductions provision in the royalty payment clauses.

The MEC, by its terms, *expressly negates* the form language in the royalty clause that would otherwise permits deductions of "the cost to transport, treat and process the gas and any losses in volumes to *point of measurement that determines revenue realized by Lessee*."  (Ex. A, Royalty Clause (emphasis added).)  However, the MEC states that there shall be *no deduction of costs* to the lessor for any of the production, gathering, or various other services required to bring the gas to the point at which it may be sold into the market.

There is no record to allow the Court to conclude that the Proposed Settlement should be approved in light of the lease language.  To the contrary, the Proposed Settlement allows Chesapeake automatically to treat the gas as marketable at the wellhead and permits Chesapeake to take deductions regardless of whether it can demonstrate it has enhanced value, thus eliminating the protections that the MEC gives to Mrs. Sarnosky and those similarly situated. This position is facially untenable given the complete lack of any type of a market for gas in Mrs. Sarnosky's backyard.

The Proposed Settlement requires the Court—and class members—to agree with the position—apparently Chesapeake's—that the MEC does not in fact provide anything to lessors who thought they were signing leases that prevented Chesapeake from taking deductions.  This is particularly troublesome given the allegations in the lawsuit brought by the Attorney General. Indeed, the Attorney General alleges that Chesapeake "misled Pennsylvania Landowners into believing they were signing leases free of deductions, were reaping the full benefit of a sale to an unrelated third party, ***and were otherwise insulated from deductions through the Market Enhancement Clause***."  (*Id*. at 187.)

### C.    Pennsylvania Law Does Not Support the Proposed Settlement's Royalty Payment Scheme

Analysis of the relevant law further demonstrates how the Proposed Settlement does not provide class members the benefits of the MECs.  Pennsylvania's Supreme Court has addressed the question of post-production deductions and acknowledged that specific lease language is crucial to determining whether such deductions will be allowed.

In *Kilmer v. Elexco Land Services, Inc.*, 990 A.2d 1147 (Pa. 2010), while the court did not consider the effect of MECs on royalty calculations, the court addressed the construction of the term "royalty" as it is used in the Guaranteed Minimum Royalty Act, 58 P.S. § 33 ("GMRA").  At issue in that case was whether the GMRA would permit an energy company to use a "net-back method" of calculating royalties.  Gas producers use net-back methods to deduct various costs of rendering gas marketable before calculating royalties, effectively representing an attempt to establish the value of the gas at the wellhead.  *Id*. at 1149 & n.3.  The net-back method determines what the royalty would have been at the wellhead by starting with the price paid at a downstream point of sale and then deducting the post-production costs required to get the gas into marketable condition and to the point of sale.  *See id*. at 1150.  This is critical because, as the

court reasoned, *there is no market for gas at the wellhead*. *See id*. at 1157 (noting that, in the current state of the industry, "the wellhead and the point of sale are not the same"). Yet the Proposed Settlement presumes that there is.

Ultimately, the court held that the GMRA would permit a lessor to agree to a "net-back" method of calculating royalties at the wellhead. *Id*. at 1158. In doing so, the court explained that the GMRA does not *mandate* calculation of royalties at the wellhead. Rather, it expressly stated that the GMRA *permits* the calculation of royalties at the wellhead when that is what the parties contract for. *See id*. at 1158. Thus, the court stated that the GMRA establishes a floor, not a ceiling, on the royalties guaranteed as a matter of law by the GMRA. In connection with this reading of the GMRA, the court acknowledged the gas company's contention that "nothing in the GMRA restricts the parties from contracting for a different point of measurement downstream of the wellhead so long as it provides at a minimum for a royalty of one-eighth at the point of removal – the wellhead." *Id*. at 1154. Therefore, *Kilmer* stands for the proposition that courts must review leases carefully on a case-by-case basis to determine where and how royalties are to be calculated and that such leases must, at the bare minimum, provide for a royalty of one-eighth at the wellhead. Parties continue to be able—as they were here—to contract for a different point of measurement downstream of the wellhead (*i.e.*, at the downstream point at which Chesapeake realizes revenue), using a different method to calculate royalties (*i.e.,* free of post-production costs unless the lessor can show it has enhanced value).

As explained above, and unlike the lease in *Kilmer*, the lease forms here contemplate a downstream point of measurement. A lease such as Mrs. Sarnosky's lease expressly requires that the gas be *marketed*, not merely produced, and that royalties be based on the "*point of measurement that determines the revenue realized by lessee*," which for Chesapeake is at the

point where it or its affiliate sells the gas to a third party on the open market, not at the wellhead, a point of intra-Chesapeake company transfer from one subsidiary to another in a vertically integrated supply chain.  As noted above, *Kilmer* recognizes that there is not a market for gas at the wellhead (*i.e.*, gas is not marketable at the wellhead).  The Proposed Settlement, which assumes gas is marketable at the wellhead and that any downstream sale whatsoever represents an enhancement of the value of the gas, therefore stands in direct conflict with *Kilmer*.[8]

## III.  THE PROPOSED SETTLEMENT IMPROPERLY ATTEMPTS TO SHIELD THE FUTURE ROYALTY PAYMENT METHODOLOGY FROM LEGAL CHANGES

In addition, the Proposed Settlement purports to bind class members to a prospective royalty payment methodology in which Chesapeake will be permitted to deduct 66% of its purported post-production costs in perpetuity.  The motion for final approval does not address that the Proposed Settlement purports to bind class members to this arrangement in perpetuity "***notwithstanding any current or future law, statute, judicial decision, or rule regulating the payment of Royalties in Pennsylvania***."  (Proposed Settlement at ¶ 6.8 (emphasis added).)  This provision of the Proposed Settlement  is contrary to the typical MEC, which provides that "It is

_____

[8] The Proposed Settlement's terms likewise appear inconsistent with the weight of developing authority both at the federal level and in gas-savvy jurisdictions such as West Virginia, Oklahoma, and Colorado.  *See generally Burlington Resources Oil & Gas Co. v. United States Dep't of Interior*, No. 13-CV-678, 2014 U.S. Dist. LEXIS 100900 (N.D. Okla. July 24, 2014) (noting post-production costs are disfavored and, because they are necessary to make gas marketable, generally not allowed as a deduction); *Rogers v. Westerman Farm Co*., 29 P.3d 887 (Colo. 2001) (noting implied covenant to market obligates the lessee to incur the costs necessary to render the gas ready for a commercial market and that only costs incurred after a marketable product has been obtained that further enhance the value of the gas are shared between lessor and lessee); *TXO Prod. Corp. v. Oklahoma*, 903 P.2d 259 (Okla. 1994) (observing an implied duty to market means the lessee has a duty to get the product to the place of sale in marketable form, including bearing costs of preparing the gas for market); *Wood v. TXO Prod. Corp*., 854 P.2d 880 (Okla. 1992) (same); *Estate of Tawney v. Columbia Natural Resources, LLC*, 633 S.E.2d 22 (W. Va. 2006) (observing the "duty to market embraces the responsibility to get the oil or gas in marketable condition and actually transport it to market").

agreed between the Lessor and Lessee that, notwithstanding any language herein to the contrary, all oil, gas or other proceeds accruing to the Lessor under this lease *or by state law* shall be without deduction **. . . .**" The Proposed Settlement, in purporting to override current and future state law writes this term of the class members' MECs.

Further, this clause in the Proposed Settlement is unfair in light of the pending enforcement action brought by the Attorney General against Chesapeake.  If the Attorney General were to win injunctive relief under the Unfair Trade Practice and Consumer Protection Law to prohibit Chesapeake from taking its improper deductions in violation of the MECs, Chesapeake could point to the Proposed Settlement's clause insulating its royalty payment scheme from "any future . . . judicial decision . . . regulating the payment of Royalties in Pennsylvania."  (Proposed Settlement at ¶ 6.8.)

## IV.    THE   MOTION   FOR   FINAL   APPROVAL   DOES   NOT   EXPLAIN   THE RATIONALE FOR REDUCING THE RELIEF TO THE CLASS ON A GOING FORWARD BASIS OR FOR TENSIONS AMONG SEGMENTS OF THE CLASS

The Proposed Settlement offers greater relief to class members who have property that has produced more gas in the past than to those whose property will produce more in the future. Under the Proposed Settlement, Chesapeake will return 55% of the improper deductions it took prior to June 1, 2014.  However, it will return only 34% of the improper deductions it took after June 1, 2014.  The motion for final approval does not explain why or on what basis the relief drops from a more favorable 55% return of improper deductions take prior to June 1, 2014, to a return of only 34% of improper deductions from that time until the effective date of the Proposed Settlement, let alone why it is fair or reasonable to lock class members into an arrangement in which Chesapeake will be permitted to take 66% of its deductions on a going forward basis in perpetuity irrespective of intervening changes in the law.

The failure to explain the decrease in relief for deductions taken after June 1, 2014, does not provide the Court with an adequate basis to make factual findings about the fairness of the relief.

In addition, there is still a lot of gas in the ground in the Marcellus region.  *See, e.g.*, Chesapeake Energy Pennsylvania Overview, available online at

http://www.chk.com/operations#/pennsylvania (noting current company production of more than 2 billion cubic feet of natural gas per day in Pennsylvania); 2014 Annual Report on Form 10-K at 6-9 (noting significant proven natural gas reserves in Chesapeake's Northern Operating Division, including the Marcellus Shale region).[9]  Indeed, Chesapeake CEO Doug Lawler, in a conference call describing Chesapeake's third quarter 2015 results, made this clear, stating that Chesapeake's Marcellus acerage is "currently held by production."  Mr. Lawler correctly noted that, because the acreage was held by production, Chesapeake has "development and timing flexibility."[10]  Translated into layman's terms, Chesapeake has drilled a small fraction of the wells required for full development of its Pennsylvania leases.  The practical implication of Chesapeake's drilling strategy is that most of the gas—and most of the class members' money— is still in the ground.  Thus, the structure of the settlement, in paying 55% of improper deductions taken prior to June 2014, and 34% of those taken after June 2014, represents a massive financial benefit to Chesapeake at the expense of the class and is, therefore, facially unfair.

---

[9] The 2014 Annual Report on Form 10-K is part of Chesapeake's 2014 Annual Report available at http://www.chk.com/documents/media/publications/annual-report-2014.pdf.

[10] See Transcript of Third Quarter Earnings Conference Call, available at http://seekingalpha.com/article/3645806-chesapeake-energy-chk-robert-douglas-lawler-on-q3-2015-results-earnings-call-transcript?page=2.

PHDATA 5537341_6

Because of the way this relief is structured, those class members whose properties produced more gas in the past (*i.e.*, prior to June 1, 2014) will receive a much larger benefit than those whose properties are only now ramping up in production.  Class Counsel offers no explanation or justification for this differing treatment of groups within the class.

Fairness among class members is critical in class settlements.  Disparate treatment of segments within a class is a red flag that alerts courts that a settlement may not be fair.  *See In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 808 (3d Cir. 1995) ("One sign that a settlement may not be fair is that some segments of the class are treated differently from others.").  Indeed, differential treatment of groups within a class is a basis for disapproving a class settlement.  *See Petruzzi's, Inc. v. Darling-Delaware Co., Inc.*, 880 F. Supp. 292, 299 (M.D. Pa. 1995) ("This disparate treatment of class members has not been justified by the settlement proponents, and is sufficient reason in and of itself to disapprove the proposed settlement.").

Because the Proposed Settlement offers greater benefits to those whose property produced significant amounts of gas prior to June 1, 2014, and significantly lesser benefits to those whose properties produced gas after June 1, 2014 (or those whose properties have yet to produce gas), and because the motion for final approval offers no rationale or factual basis to support this disparate treatment, the Proposed Settlement should be disapproved as unfair.

## V.   THE RELEASE IS OVERLY BROAD AND REACHES CLAIMS BEYOND THOSE IN THE COMPLAINTS, INCLUDING CLAIMS AGAINST THIRD PARTIES AND INVOLVING ISSUES OF CHESAPEAKE SALES OF GAS TO AFFILIATES INSTEAD OF ON THE OPEN MARKET

The release in the Proposed Settlement releases not only the claims that class members have directly against Chesapeake for its improper deduction practices but also any claims they may have against third parties (*i.e.*, working interest owners) relating to improper royalty

payments.  Additionally, the Proposed Settlement releases claims beyond those articulated in the complaints in the *Demchak* and *Burkett* actions, including claims based on potential royalty payment issues arising from Chesapeake's sale of gas to its affiliates in less than arm's length transactions.

The release clause of the Proposed Settlement provides, in part:

> Plaintiffs and the Settlement Class Members hereby further agree that they fully and forever release and discharge ***all working interest owners*** on whose behalf Defendant has paid or will pay Royalties pursuant to Pennsylvania Leases from any and all of the Settled Claims, but do so only to the limited extent of Defendant's payments of Gas Royalties on behalf of such working interest owners.

(Proposed Settlement ¶ 12.1.1.)  The motion for final approval does not explain or identify who these non-party working interest owners are, let alone why class members' claims against them are being released in the Proposed Settlement.  There does not appear to be any consideration included in the Proposed Settlement in exchange for the release of these claims against third parties.

In addition, the claims being released go beyond those directed at Chesapeake's improper deduction of post-production costs, the subject of this lawsuit.  The "Settled Claims" include  "(i) ***challenges to the manner in which sales are made to an affiliated entity, if any***, (ii) claims that formation, sale or disposition of assets or equity interests by Chesapeake and/or its Affiliates . . . impacted Royalty payments, and (iii) ***any other challenges to the reasonableness of Post-Production cost deductions***."  (Proposed Settlement ¶ 1.38 (emphasis added).)

The motion for final approval offers no explanation or justification whatsoever for the release of claims involving challenges concerning the impropriety of Chesapeake "selling" gas to affiliated entities.[11]

The question of whether Chesapeake improperly calculated royalties based on transfer prices to affiliated entities is not complicated: it is a discrete legal issue.  Further, the Attorney General's complaint alleges that Chesapeake misrepresented the role of its affiliate CEML to class members in order to take greater deductions from their royalty payments.  Thus, the scope of the release is critical and must be evaluated carefully.

## VI.  CLASS COUNSEL HAS NOT ESTABLISHED THAT THEY ARE ENTITLED TO A FEE BASED ON THE PROPOSED SETTLEMENT'S FUTURE ROYALTY CALCULATION METHODOLOGY

Class Counsel is seeking a fee of thirty-three and one-third percent (33.3%) of the lump sum payment Chesapeake will make for its improper past deductions.  (Fee Br. (Docket No. 100) at 2.)  With that fund expected to exceed $18,000,000, Class Counsel seeks more than $6 million for the past relief.  Class Counsel additionally seeks thirty-three and one-third percent (33.3%) of the 34% reduction in Chesapeake's improper future deductions for three years following the Settlement.  (*See id.* at 2.)  These fees are to be borne by members of the Settlement Class.

---

[11] The insufficiency of affiliate transfer prices as a basis for royalty calculations is the consensus reached by courts that have addressed the issue:

> One point on which almost all courts have agreed is that the existence of an internal company "price" for an affiliate transfer does not itself justify paying less than otherwise would be due. Courts generally have been skeptical of affiliate transactions, and have tended to refuse to accept an affiliate price if it deviates from prices readily available in the marketplace.

John Burritt McArthur, *Oil and Gas Implied Covenants for the 21st Century* 220 (2014).

Class Counsel has not made an adequate factual record to support the reasonableness of its requested fee based on forward looking relief.  There is no estimate or other evidence, for instance, of how that portion of the fee requests matches up with a lodestar crosscheck or as a reasonable overall fee for counsels' work.  This is particularly important since, as discussed above, there is a large amount of gas still in the ground that can be used as the basis for a fee calculation over the next three years.

Further, the fees for going forward relief create a tension between the interests of Class Counsel and the class, providing no incentive to Class Counsel to enter an agreement that limits the costs of the deductions Chesapeake takes.  To the contrary, the greater the purported post-production costs charged by Chesapeake on a going forward basis, the more Class Counsel will receive as fees under their request.  For example, if the post-production costs on a unit of gas were \$1, then Chesapeake would be permitted to deduct 34%, or 34 cents.  Class Counsel would receive approximately 11 cents (approximately 33% of the value of the reduction in the deduction).  However, if Chesapeake were to charge \$2 in post-production costs for the same unit of gas, then Chesapeake would be permitted to deduct 34%, or 68 cents.  Class Counsel would then receive approximately 22 cents (approximately 33% of the value of the reduction in the deduction).  Thus, under the requested fee structure for forward-looking relief, Class Counsel benefit if Chesapeake's post-production costs rise over the next three years.

## **CONCLUSION**

For the foregoing reasons, the Proposed Settlement should not be approved.

    s/Ira Neil Richards
Ira Neil Richards (PA 50879)
Kenneth I. Trujillo (PA 46520)
Arleigh P. Helfer III (PA 84427)
Shannon L.C. Ammon (PA 318939)
SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103
Voice: (215) 751-2000
Facsimile: (215) 751-2205
irichards@schnader.com

Aaron D. Hovan (PA 308412)
154 Warren Street
Tunkhannock, PA 18657
(570) 836-3121

Richard L. Huffsmith (PA 78895)
28 East Tioga Street
Tunkhannock, PA 18657
(570) 240-4400

## <u>CERTIFICATE OF SERVICE</u>

I, Ira Neil Richards, hereby certify that I caused a true and correct copy of the forgoing Objections of Class Member Lillian Sarnosky to Amended Class Action Settlement to be filed today, December 17, 2015, and electronically served on counsel of record via the Court's ECF filing system, where the document is available for viewing and downloading.  I further certify that I caused a true and correct copy of the foregoing to be transmitted via U.S. First Class mail to:

> Clerk of the Court
> United States District Court, Middle District of Pennsylvania
> United States Courthouse
> 235 North Washington Avenue
> Scranton, PA 18503
>
> Larry D. Moffett
> Daniel Coker Horton & Bell, P.A.
> P.O. Box 1396
> Oxford, MS 38655-1396
>
> *Counsel for the Class*
>
> Daniel T. Donovan
> Kirkland & Ellis, LLP
> 655 15th Street, N.W., Suite 1200
> Washington, D.C. 20005-5793
>
> *Counsel for Chesapeake Appalachia, LLC*

 s/Ira Neil Richards